**BOARDMAN PETROLEUM, INC. d/b/a Red & Jack Oil Company, Plaintiff,**

v.

**FEDERATED MUTUAL INSURANCE COMPANY and American Automobile Insurance Company, a wholly owned subsidiary of Fireman's Fund Insurance Company, Defendants.**

Civil A. No. CV 193–33.

United States District Court, S.D. Georgia, Augusta Division.

Sept. 29, 1995.

---

Raymond Gordon Chadwick, Jr., Robert Perry Sentell, III, Kilpatrick & Cody, Augusta, GA, for Boardman Petroleum, Inc.

Richard R. Mehrhof, Jr., Allgood, Childs, Mehrhof & Millians, Augusta, GA, Charles E. Spevacek, Laura J. Hanson, Aaron B. Latto, Meagher & Geer, Minneapolis, MN, for Federated Mutual Insurance Company.

Robert L. Allgood, N. Kenneth Daniel, Allgood & Daniel, Augusta, GA, Patrick Michael Shine, Jon E. Elenius, Caron, Greenberg & Fitzgerald, Chicago, IL, Bridget K. Galane, Caron, Greenberg & Fitzgerald, San Francisco, CA, for American Automobile Ins. Co.

1. Oral argument would not materially assist the Court in resolving the pending motions. Federated's Request for Oral Argument is DENIED.

2. Defendant American Automobile Insurance Company is a wholly owned subsidiary of Fireman's Fund Insurance Company.

3. See Appendix A to this Order.

4. Generally speaking, "occurrence-based" policies insure against damages that happen or oc-

## ORDER

BOWEN, District Judge.

Fireman's Fund Insurance Company's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART;** Boardman Petroleum, Inc.'s Motion for Partial Summary Judgment is **GRANTED IN PART AND DENIED IN PART** and its Motion for Leave of Court to Amend Complaint is **DENIED;** Federated Mutual Insurance Company's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART.**[1]

### I. *Background*

In this declaratory judgment action Boardman Petroleum, Inc. d/b/a Red & Jack Oil Company ("Boardman") seeks a determination that Federated Mutual Insurance Company ("Federated") and Fireman's Fund Insurance Co. ("Fireman's Fund"),[2] Boardman's insurers, are liable for clean-up costs and defense expenses incurred as a result of underground petroleum contamination at two Smile Gas Stations. Since the 1950's, Boardman has owned and operated a chain of Smile Gas Stations in Georgia, Florida, North Carolina, South Carolina and Virginia. The Smile Gas Stations concerned in this litigation are located at 126 West Indiantown Road, Jupiter, Florida (designated by Boardman as "Smile Gas Station No. 8" and referred to hereafter as "Smile 8") and 2801 Wrightsboro Road, Augusta, Georgia (referred hereafter as "Smile 3").

### The Insurance Policies[3]

Provisions of two types of insurance policies are at issue: occurrence-based general liability policies ("general liability policies") and claims-made pollution liability policies ("pollution liability policies").[4] For the periods August 15, 1977, to August 15, 1985, Federated sold general liability policies to Boardman to cover its Smile Gas Stations.[5]

cur during the dates of coverage. "Claims-made" policies provide coverage only if a claim is made by the insured during the dates of coverage.

5. Federated issued corresponding umbrella policies that contained coverage provisions identical to that in the general liability policies. For the moment, amounts of coverage are not relevant. The issues raised at summary judgment concern only whether, under the coverage provisions,

From August 15, 1985, to August 15, 1986, Boardman's Smile Gas Stations were insured under general liability policies issued by Fireman's Fund.[6] Federated also insured Boardman's Smile Gas Stations under pollution liability policies with combined dates of coverage from August 15, 1987, to February 15, 1990.[7] Smile 8 and Smile 3 were insured properties under the general liability policies of both Defendants and under Federated's pollution liability policies.

Defendants rely on several sections of these policies to support denial of coverage. The foremost issue in this case, however, is the correct "trigger" of coverage under the general liability policies. The "trigger" issue is paramount because the facts in this case involve burial contamination from petroleum contained in underground storage tanks ("UST's"). At two of Boardman's gas station sites, UST's leaked petroleum into the surrounding property. Due to its latent character, burial contamination may remain undetected for months or years. When latent property damages are discovered *after* the dates of insurance coverage, an issue arises as to whether coverage applies.[8]

Two schools of thought on this issue are well and fervently represented by the litigants in this case. Under Boardman's "exposure" trigger theory, coverage applies if the contamination *develops* during the dates of coverage. The "manifestation" trigger theory, adopted in this litigation by Federated,[9] is that a claim for latent contamination is not covered unless *discovered* within the policy period. Although the trigger issue has been addressed by some federal courts and other state jurisdictions, it has not been addressed by a Georgia appellate court or the General Assembly.[10]

### Smile 8

Boardman purchased Smile 8 in 1979. Operation began in 1980. Boardman installed five UST's at Smile 8. In 1984, newly-enacted Florida legislation mandated installation of leak detection systems on existing UST's by January 1, 1989.

In 1988, testing revealed that one of the Smile 8 UST's was leaking. Boardman took the leaking UST out of service. On September 22, 1989, Boardman notified Federated of the contamination discovery. At this time Smile 8 was insured under Federated's pollution liability policy. On December 19, 1989, Federated notified Boardman that Federated would handle the claim under the pollution liability policy subject to a complete reservation of rights. Boardman did not notify Fireman's Fund of the contamination discovered at Smile 8 until December 16, 1992.

On February 20, 1990, the remaining UST's at Smile 8 were removed. The Florida Department of Environmental Regulation (FDER) demanded that Boardman remediate the petroleum contamination at Smile 8. Boardman filed a Notice of Discharge with the FDER and sought to obtain funding under Florida's Pollution Liability Insurance and Restoration Program for remediation. The FDER denied Boardman's request because Boardman had not installed proper leak detection equipment in accordance with the 1984 Florida UST regulations. On April 1, 1990, Federated determined that Boardman was not entitled to clean-up costs reimbursement under the pollution liability policy. This decision was based on a Coordination of

---

Boardman's claims for clean-up costs and defense expenses are covered claims.

**6.** After August 15, 1986, Federated issued general liability insurance to Boardman again. That insurance is not at issue in this litigation.

**7.** The policies were issued from year to year. Federated sold Boardman pollution liability insurance with dates of coverage from August 15, 1988, to August 15, 1989. This policy was later given a retroactive date of coverage to August 15, 1987. At the expiration of that policy, Federated issued pollution liability insurance to Boardman for the period August 15, 1989, to August 15,

1990. Federated terminated that coverage, however, effective February 15, 1990.

**8.** The same issue arises in the bodily injury context. As cases surveyed by counsel reflect, much litigation has taken place over the proper trigger of coverage for latent personal injury claims.

**9.** See note 16, *infra*, and accompanying text, noting Federated's prior apparently inconsistent position on the trigger issue.

**10.** Nor has it been addressed by a Florida appellate court. As discussed *infra*, however, Georgia law will govern this insurance dispute.

Benefits endorsement in the policy. Under the endorsement, coverage does not exist unless the insured complies with all state regulations that would entitle the insured to government clean-up funds.

Tropic Tint is an automobile and residential window tinting business in West Palm Beach, Florida, located next to the former Smile 8. On February 19, 1992, Tropic Tint filed suit against Boardman. Tropic Tint's complaint alleged damage to its real property caused by migrating petroleum contamination. On February 28, 1992, Boardman notified Federated of the *Tropic Tint* lawsuit. By letter dated March 9, 1992, Federated denied coverage under its general liability policy based on an absolute pollution exclusion found in the policy. By letter dated March 12, 1992, Federated also denied coverage under its pollution liability policy because that policy, a claims-made policy, expired February 15, 1990, prior to the date the *Tropic Tint* suit was filed. Boardman did not notify Fireman's Fund of the *Tropic Tint* suit until December 1992.[11]

In December 1992, Boardman informed Federated and Fireman's Fund that a report by International Fuel and Lubrication Consultants supported the theory that petroleum contamination at Smile 8 emanated from gasoline produced prior to 1984. The report implicated coverage under earlier general liability policies of the two insurers. Federated and Fireman's Fund agreed to pay for the defense costs of the *Tropic Tint* litigation, subject to a reservation of rights.

### Smile 3

From 1955 to December 1986, Boardman leased and operated Smile 3. The landowner was PGC Associates. When Boardman closed Smile 3 in 1986, UST's were removed from the property. The removal of the UST's did not reveal any contamination. In May 1988, however, environmental consultants hired by PGC Associates discovered petroleum contamination.

On December 28, 1990, PGC Associates filed a lawsuit against Boardman in this United States District Court.[12] PGC Associates alleged that its property was damaged as a result of petroleum contamination from the UST's at Smile 3. On February 22, 1991, Boardman tendered the defense of PGC Associates' complaint to Federated and Fireman's Fund. On April 18, 1991, Federated and Fireman's Fund agreed to assume the defense of the case under reservation of rights. On March 10, 1992, Federated filed a declaratory judgment action in this Court, seeking a determination that Federated did not have an obligation to indemnify or defend Boardman in the PGC Associates lawsuit. Fireman's Fund filed a cross claim requesting similar relief.

During the pendency of *PGC Associates v. Boardman,* Boardman and its insurers performed environmental tests at the former Smile 3 site. The tests indicated significant groundwater contamination in and around former tank beds. On October 7, 1992, Boardman notified the Georgia Department of Natural Resources (GDNR) of the contamination discovered at Smile 3. On October 19, 1992, the *PGC Associates* action in this Court was dismissed without prejudice by stipulation. In December of 1992, the declaratory judgment action in this Court was also dismissed without prejudice.

On February 3, 1993, the GDNR informed Boardman that corrective measures would be required to remediate the Smile 3 site. Boardman gave Federated and Fireman's Fund notice of the GDNR's letter claim and requested that the insurers defend and indemnify Boardman under the general liability policies. The Defendants reserved their rights to deny coverage of Boardman's claim for the mandated remediation costs.

Ultimately, both Defendants denied coverage of Boardman's various claims in connection with Smile 8 and Smile 3. Boardman originally filed this action in Superior Court.

---

11. Case No. CL92–1931–AO in the Circuit Court of the Fifteenth Judicial Circuit for Palm Beach County, Florida. *Tropic Tint* was tried to the Court. At the conclusion of the bench trial, judgment was entered on April 11, 1994, for Tropic Tint in the amount of $109,259.85 in damages and $433,741.83 in attorneys' fees and litigation costs.

12. *PGC Associates v. Boardman Petroleum, Inc.,* CV 190–316 (S.D.Ga.1990).

The case was removed to this Court on February 19, 1993. Plaintiff's First Amended Complaint [13] alleges that the Defendants breached their insurance contracts with Plaintiff; that Defendants have acted in bad faith and have been stubbornly litigious in violation of O.C.G.A. § 13–6–11; and seeks a declaratory judgment that Defendants are liable under the insurance policies for clean-up costs and defense expenses incurred by Boardman as a result of the petroleum contamination at Smile 8 and Smile 3.

## II. Plaintiff's Motion for Leave to Amend Complaint

■ On November 22, 1994, Boardman filed a Motion for Leave of Court to Amend its Complaint. Boardman desires to augment its First Amended Complaint with counts for fraudulent concealment under O.C.G.A. § 23–2–53 and punitive damages.[14] Defendants oppose the Motion.

Boardman now contends that both Defendants fraudulently concealed from their insureds, including Boardman, the fact that they employed the manifestation trigger of coverage in their insurance contracts. According to Boardman, "[b]y concealing ... the trigger of coverage interpretation problem and the fact that the defendants had previously adopted a manifestation trigger of coverage, they fraudulently induced Boardman to purchase their insurance policies and thereby derived a benefit they would not have otherwise been able to obtain." Boardman's Nov. 22, 1994, Br. at 19. Boardman asserts that discovery has disclosed internal documents proving that Federated and Fireman's Fund knew before and during the effective dates of the general liability policies of the trigger of coverage issue.

Boardman argues that allowing the requested amendment would not prejudice the Defendants; no additional discovery would be required to support the new claims; and the proposed amended claims are closely related to the bad faith claims already contained in Boardman's Complaint. The Defendants counter that Plaintiff's Motion should be denied because it is untimely; Boardman has not offered justification for the delay in seeking leave; leave would prejudice them; and, in any event, the amended claims would prove futile.

After responsive pleadings have been served, the Court has discretion to grant leave to amend. Fed.R.Civ.P. 15(a). Leave to amend "shall be freely given when justice so requires." *Id.; see generally Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Leave is not automatic, however. *Addington v. Farmer's Elevator Mut. Ins. Co.,* 650 F.2d 663, 666 (5th Cir.), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981). "The function of Rule 15(a) ... is to enable a party to assert matters that were overlooked or were unknown at the time he interposed the original complaint or answer." 6 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1473. The Court has considerable discretion in addressing a motion for leave to amend. *United Ass'n of Journeymen & Apprentices etc. v. Georgia Power Co.,* 684 F.2d 721 (11th Cir.1982).

The arguments of each party have merit. As the case should proceed to trial as quickly as possible, the Court's overriding concern is whether progression toward final resolution of this dispute would be delayed by allowing the additional claims. Plaintiff's contention that no further discovery would be necessary is unpersuasive. Fraudulent concealment and bad faith claims are similar in that each concerns Defendants' conduct at the time of the subject transactions. Bad faith under O.C.G.A. § 13–6–11 and fraudulent concealment under O.C.G.A. § 23–2–53 are nevertheless distinct claims, with different elements of proof. *See McLendon v. Georgia Kaolin Co., Inc.,* 837 F.Supp. 1231, 1239 (M.D.Ga.1993) (enumerating the elements of fraudulent concealment under O.C.G.A.

---

13. The original Complaint limited Plaintiff's claims to Smile 8. Boardman's First Amended Complaint added claims in connection with Smile 3.

14. O.C.G.A. § 23–2–53 provides:

Suppression of a material fact which a party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.

§ 23–2–53). Permitting the fraudulent concealment claim without allowing defensive discovery tailored to the new claim would be unfair.

There will be no additional discovery. Discovery closed in August 1994. It was extensive, time consuming, laborious and undoubtedly very expensive. The parties' continuous wrangling necessitated the extraordinary measure of requiring a United States Magistrate Judge's personal supervision at depositions. Boardman has not shown, furthermore, a legitimate reason for waiting until now, months after the close of discovery and years after the Complaint was filed, for seeking leave to amend. Plaintiff's implication that the fraudulent concealment claim was not ascertainable prior to discovery is unavailing. As Plaintiff observes, "the dispute over the appropriate trigger of coverage for latent bodily injury and property damage type claims was raging within the insurance industry by the late 1970's," Boardman's Nov. 22, 1994, Br. at 12, *prior* to the parties' execution of the subject insurance agreements. Contrary to Boardman's assertions, the "trigger of coverage interpretation problem" was not "concealed" by the Defendants, Boardman's Nov. 22, 1994, Br. at 19, since the issue, if "raging," was known to sophisticated entities engaged in petroleum-related business. At the time Boardman filed its Complaint, it knew of the Defendants' alleged, pre-contract misrepresentations about their position on the trigger of coverage issue. *Id.* at 16. Boardman likewise knew at the time it filed its Complaint that Defendants' position at that time on the trigger of coverage issue was inconsistent with prior representations. A cause of action for "fraudulent concealment" could have been ascertained well before now. Therefore, the Motion for Leave of Court to Amend Complaint is **DENIED**.

### III. *The Parties' Contentions at Summary Judgment*

#### A. *Federated*

Federated urges the Court to make the following summary judgment determinations:

(1) that its pollution liability policy does not cover Smile 8 because Boardman failed to comply with Florida clean-up fund requirements and because the *Tropic Tint* claim was not made during a pollution liability policy period; (2) that the general liability policies in force from 1977 to 1985 do not provide coverage because they were not triggered during the policy period; (3) that extrinsic evidence is not admissible to vary the terms of the contracts; (4) that the "owned or rented" property exclusion in each general liability policy bars coverage for all or part of Boardman's claims; (5) that no duty to defend exists under the general liability policies as regards Boardman's claims arising out of the FDER and the GDNR letters mandating remediation; (6) that the "sudden and accidental" pollution exclusions in the 1979–1982 general liability policies [15] preclude coverage as to Smile 8 under Florida law; and (7) that Boardman's bad faith/stubborn litigiousness claim is without merit because the trigger issue is an open question of law. Federated's Oct. 17, 1994, Br.

#### B. *Fireman's Fund*

Fireman's Fund argues that the Court should find (1) that Boardman breached provisions of the general liability policy by giving late notice to Fireman's Fund of the contamination at Smile 8; (2) that Boardman cannot sustain its burden of proving that Fireman's Fund acted in bad faith; (3) that manifestation is the appropriate trigger of coverage in environmental property damage cases; (4) that the general liability policy does not cover government-mandated clean-up costs; (5) that the "owned or rented" exclusion in Fireman's Fund's general liability policy precludes coverage for certain remediation costs; (6) that a state environmental agency's letter mandating remediation is not a "suit" within the meaning of the Fireman's Fund policy; and (7) that all clean-up costs voluntarily incurred by Boardman prior to notifying Fireman's Fund of the claim are not recoverable. Fireman's Fund's Oct. 17, 1994, Br.

---

**15.** Apparently, the exclusion was not incorporated in the policies issued for other coverage periods.

## C. *Boardman*

Boardman argues that the Court should determine (1) that the "sudden and accidental" pollution exclusion does not exclude coverage for the clean-up of contamination at Smile 8; (2) that the appropriate trigger is the "exposure" trigger; (3) that costs incurred by Boardman to assess and remediate Smile 8 and Smile 3 are "damages" as that term is used in the general liability policies issued by Federated and Fireman's Fund; and (4) that the "owned or rented property" exclusion does not bar coverage for remediation of Smile 8 and Smile 3. Boardman's Oct. 17, 1994, Br.

## IV. *The Issues*

The parties' various summary judgment contentions raise, in no particular order, the following issues:

(1) Which state's law determines the insurance issues raised in this litigation as to Smile 8?

(2) What is the appropriate trigger of coverage under the Defendants' general liability policies?

(3) Does unsettled state law regarding the trigger of coverage in burial contamination cases render Plaintiff's claims for bad faith and stubborn litigiousness without merit?

(4) Is extrinsic evidence admissible to vary the terms of the general liability policies?

(5) Was Boardman's failure to give Fireman's Fund immediate notice of the contamination at Smile 8 a breach of Fireman's Fund general liability policy?

(6) Does Boardman's failure to comply with Florida clean-up fund requirements bar coverage under Federated's pollution liability policies?

(7) Does the filing of *Tropic Tint* after the last day of coverage under Federated's pollution liability policy bar recovery thereunder?

(8) Does the "sudden and accidental" pollution exclusion contained in the 1979–1982 general liability policies preclude coverage thereunder?

(9) Does the "owned or rented" property exclusion in Defendants' general liability policies bar coverage of all or a portion of Boardman's claims?

(10) Are the FDER and GDNR letters mandating remediation "suits" within the meaning of Defendants' general liability policies?

(11) Are costs Boardman incurred to assess and remediate Smile 8 and Smile 3 "damages" as that term is used in Defendants' general liability policies?

(12) Are costs voluntarily incurred by Boardman prior to giving Fireman's Fund notification of a claim covered under Fireman's fund general liability policy?

## V. *Analysis*

### A. *Requirements for Summary Judgment*

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The applicable substantive law identifies which facts are material in the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

"The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). When the *moving* party has the burden of proof at trial, that party must carry its burden at summary judgment by presenting evidence affirmatively showing that, "on all the essential elements of its case ..., no reasonable jury could find for the non-moving party." *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1438 (11th Cir.1991) (en banc). When the *non-moving* party has the burden of proof at trial, the moving party may carry its burden at summary judgment either by presenting evidence negating an essential element of the non-moving party's claim or by pointing to specific portions of the record which demonstrate that the non-

moving party cannot meet its burden of proof at trial, *see Clark*, 929 F.2d at 606–608 (explaining *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); merely *stating* that the non-moving party cannot meet its burden at trial is *not* sufficient, *Clark*, 929 F.2d at 608. Any evidence presented by the movant must be viewed in the light most favorable to the non-moving party. *Adickes*, 398 U.S. at 157, 90 S.Ct. at 1608.

If—and *only* if—the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark*, 929 F.2d at 608. The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *Morris v. Ross*, 663 F.2d 1032, 1033–34 (11th Cir.1981), *cert. denied*, 456 U.S. 1010, 102 S.Ct. 2303, 73 L.Ed.2d 1306 (1982). Rather, the non-moving party must respond by affidavits or as otherwise provided in Fed.R.Civ.P. 56. "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. A genuine issue of material fact will be said to exist "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248, 106 S.Ct. at 2510.

The clerk has given the non-moving party notice of the summary judgment motion, the right to file affidavits or other materials in opposition, and of the consequences of default; thus, the notice requirements of *Griffith v. Wainwright*, 772 F.2d 822 (11th Cir. 1985), are satisfied. The time for filing materials in opposition has expired, and the motion is ripe for consideration. The Court will proceed to review the applicable substantive law and inquire whether the moving party—and, if necessary, the non-moving party—has carried its burden as set forth above. *See Clark*, 929 F.2d at 609 n. 9.

### B. *Summary Judgment in this Case*

### (1) Which state's law determines the insurance issues raised in this litigation as to Smile 8?[16]

 Federal Courts sitting in diversity apply the forum state's choice of law rules. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In contract cases, Georgia follows the traditional *lex loci contractus* rule: a contract is governed as to its nature, validity and interpretation by the law of the state where the contract was made, unless performance of the contract occurs in another state. *General Telephone Co. of Southeast v. Trimm*, 252 Ga. 95, 311 S.E.2d 460 (1984).

The insurers maintain that Florida law applies insofar as Smile 8 is concerned. Citing this Court's decision in *Sanders v. Doe*, 831 F.Supp. 886 (S.D.Ga.1993), Defendants argue that Smile 8's situs in Florida equates to performance of the contract in Florida. Boardman argues that Georgia law should apply because the subject insurance contract was delivered in Georgia.

 The location of a contract's delivery or performance does not necessarily dictate the choice of law analysis. Rather, the overall intent of the parties is determinative. *See Mathews v. Greiner*, 130 Ga.App. 817, 819, 204 S.E.2d 749 (1974); O.C.G.A. § 13–2–3. If the parties mutually preferred one state's law over another and so indicated in their contract, the chosen state law will govern the contractual relationship unless it is contrary to the law and policy of Georgia. O.C.G.A. § 13–2–3. *See generally Pink v. A.A.A. Highway Express, Inc.*, 191 Ga. 502, 513, 13 S.E.2d 337, *aff'd*, 314 U.S. 201, 62 S.Ct. 241, 86 L.Ed. 152 (1941). Where the intent of the parties is not manifest in the contract itself, surrounding circumstances, such as where the contract is delivered or performed, may be dispositive in the choice of law analysis. Thus, conflicts cases often analyze the place of delivery or place of performance as relevant factors in the choice of law analysis.

---

**16.** The parties agree that Georgia law governs the issues pertaining to Smile 3, located in Georgia.

In Georgia, parties are presumed to contract with reference to the place where their agreement is made. *General Elec. Credit Corp. v. Home Indem. Co.*, 168 Ga. App. 344, 350, 309 S.E.2d 152 (1983). An insurance contract is "made" where it is delivered, however, not where the agreement was reached. *Pink*, 191 Ga. at 513, 13 S.E.2d 337. "The last act essential to the making of an insurance contract is the receipt of the policy by the insured which informs her of the need to begin premium payments." *General Tel. Co. of the Southeast v. Trimm*, 706 F.2d 1117, 1120 (11th Cir.1983) (applying Georgia law). Thus, "[t]he insurance contract is constructively made at the place where the contract is delivered." *Iowa State Travelers Mut. Ass'n v. Cadwell*, 113 Ga.App. 128, 130, 147 S.E.2d 461 (1966); *Atlantic Wood Indus. v. Lumbermen's Underwriting Alliance*, 196 Ga.App. 503, 396 S.E.2d 541, *cert. denied*, 498 U.S. 1085, 111 S.Ct. 958, 112 L.Ed.2d 1046 (1990). In this case, the insurance agreements were delivered in Georgia. The parties did not indicate to the contrary in their agreements or otherwise; therefore, the parties presumably intended that their contracts be governed by Georgia law. *General Elec. Credit Corp.*, 168 Ga.App. at 350, 309 S.E.2d 152.

Defendants' "place of performance" argument and purported analogy of the Court's decision in *Sanders* are unavailing. *Sanders* involved an automobile insurance contract on vehicles licensed and registered in states other than the state where the contract was delivered. Numerous deliberate contacts with the State of South Carolina—vehicles garaged and registered in South Carolina for use by employees assigned to work in South Carolina—demonstrated the parties' intent that the subject insurance agreement be governed by the laws of South Carolina, rather than Ohio, the State where the contract was made and delivered.

The place of "performance" of an insurance contract is an elusive concept as applied to insurance. Indeed, "insurance contracts often have no particular place where performance is contemplated." *General Elec. Credit Corp.*, 168 Ga.App. at 350, 309 S.E.2d 152. In the instant case the parties bargained for insurance agreements that would insure Smile Gas Stations in several southeastern states. Unlike *Sanders*, the circumstances attending these insurance agreements do not overcome the presumption that the parties intended the law of Georgia, where the contracts were delivered, determine any dispute about the insurance agreements. Certainly, the parties could not have intended that the different laws of several states would control the interpretation of the policy language.

Moreover, many of the issues joined by the parties' motions, the trigger of coverage issue in particular, involve matters of public policy.

> Even if an application of these [Georgia choice of law] rules renders the law of another state applicable, the forum, within constitutional limits, is not required to give the law of another state extra-territorial effect. That is only done as a matter of courtesy or comity, which will not be enforced if the law of the other state contravenes the public policy of the forum.

*Federal Ins. Co. v. National Distrib. Co.*, 203 Ga.App. 763, 766, 417 S.E.2d 671 (1992); *Pink*, 191 Ga. at 514, 13 S.E.2d 337; O.C.G.A. § 1-3-9. If Florida employs a different trigger theory than Georgia, it would not be enforceable by this Court sitting in Georgia. The same holds true with respect to the other issues raised in this case that invoke matters of public policy. The Court is compelled to apply Georgia law to all of the insurance issues in this case, rather than applying Georgia law to some and Florida law to other issues in an impracticable piecemeal fashion.

Furthermore, Defendants in this case could have easily written a choice of law provision into their insurance contracts, and their *post hoc* attempt to select the more favorable law is a self-serving response to their earlier inadvertence. For the foregoing reasons, the Court's provisional finding is that Georgia law will determine all issues in this case. If at trial, the Defendants tender evidence supporting a different choice of law analysis, the Court will revisit the issue.

**(2) What is the appropriate trigger of coverage under the Defendants' general liability policies?**

█ The treatment of insurance claims for latent property damage or bodily injury claims is an important matter of a state's public policy. Unfortunately, neither the Georgia legislature nor any Georgia appellate court has indicated the State's stance on the trigger of coverage issue.[17]

The Court has reviewed and considered decisions cited by the parties. Although these cases are instructive, none are binding, and none can be taken by this Court as indicative of what the Georgia Supreme Court will decide once presented with the trigger question. I will not speculate on what the Georgia Supreme Court may decide. Without an expression of public policy by the State of Georgia on the trigger issue, the Court is guided only by Georgia principles of contract construction to resolve it. O.C.G.A. §§ 13–2–1, et seq.

Proper construction of contractual language is a matter of law for the Court. O.C.G.A. § 13–2–1. Plain, unambiguous contract language, capable of only one reasonable interpretation, must be enforced. O.C.G.A. § 13–2–2(2); *Asa G. Candler, Inc. v. Ga. Theater Co.*, 148 Ga. 188, 96 S.E. 226 (1918); *R.S. Helms, Inc. v. GST Dev. Co.*, 135 Ga.App. 845, 219 S.E.2d 458 (1975). Ambiguity is construed against the drafter of the instrument.[18] *Hulsey v. Interstate Life & Accident Ins. Co.*, 207 Ga. 167, 60 S.E.2d 353 (1950); *Western Contracting Corp. v. State Hwy. Dep't*, 125 Ga.App. 376, 187 S.E.2d 690 (1972). "Where a provision in a policy is susceptible to two or more constructions, the courts will adopt that construction which is most favorable to the insured." *United States Fire Ins. Co. v. Hilde*, 172 Ga.App. 161, 163, 322 S.E.2d 285 (1984) (citations omitted). The Court examines Defendants' general liability policies accordingly.

Federated's general liability policy provides:

[t]he company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:

A. Bodily Injury, and

B. Property Damage.

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of bodily injury or property damage....

An "occurrence" is defined in the policy as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." The policy defines "property damage" as

(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

Fireman's Fund's general liability policies contain language substantially similar to that quoted above.

Defendants' general liability policies do not expressly adopt an "exposure" or "manifestation" trigger of coverage for latent personal injury or property damage claims. The most rational interpretation of the contract language is that it contemplates what the parties now refer to as an "exposure" trigger of coverage. The insurers are liable under the respective policies for property damage "caused by an occurrence." An "occurrence" is "continuous or repeated exposure to conditions" that "results in" "physical injury to or destruction of personal property *which occurs during the policy period*" and that is not "expected nor intended from the standpoint of the insured." (Emphasis added). Although this language could more clearly define an "exposure" trigger, the language

---

17. The Court notes that the Georgia Supreme Court cannot accept certification of a question of state law from a United States District Court. O.C.G.A. § 15–2–9.

18. This is especially true in a contract of adhesion, such as an insurance contract.

strongly favors Boardman's position. Boardman's interpretation of this language is far more compelling than the interpretation argued by the Defendants.

Construing the operative words by their commonly understood meanings and in proper context, the language embraces damages that develop over a period of time within the dates of coverage. The contractual definition of "property damage" twice refers to incidents "during the policy period." On the other hand words such as "manifest," "manifestation," "discover," "discovered," or other words that might connote discovery as a trigger, are not found. As Federated once succinctly argued:

> [G]iving the policy language [defining "occurrence"] its plain and ordinary meaning leads to the conclusion that there was an accident or event at the time the gasoline leak first occurred. In other words, there was an "occurrence" *at the moment gasoline was released* into the ground.

(App.Br. of Federated Mutual Insurance Company, *Safeco Insurance Company of America v. Federated Mutual Insurance Company, et al.*, 1990 WL 153990 89–2822: Boardman Exh. 40, Mot. for Partial Sum. Jud.) (emphasis added).[19]

The Court agrees. Nothing in the policy definition of "occurrence" remotely supports Federated's present interpretation that damages, as a condition precedent to coverage, must "materialize" or "become[ ] apparent during the policy period." Federated's Oct. 17, 1994, Br. at 23. The same result applies to Fireman's Fund's arguments.

Insurance companies cannot use the vagaries of language they drafted to escape contractual obligations. As authors of the insurance agreements, Defendants were obliged to craft precise language that unequivocally captures the parties' mutual understanding of the trigger. Their failure to do so was at their peril. Defendants' "manifestation"

trigger theory is rejected. The Court finds as a matter of law that exposure during dates of coverage to conditions that result in property damage constitutes an "occurrence" within the meaning of these insurance contracts. Federated's and Fireman's Fund's general liability policies will hereafter be so construed. On this issue, the Defendants' Motions for Summary Judgment are **DENIED**; Plaintiff's Motion for Partial Summary Judgment is **GRANTED**.

**(3) Does unsettled state law regarding the trigger of coverage in burial contamination cases render Plaintiff's claims for bad faith and stubborn litigiousness without merit?**

Federated maintains that "[s]ince no Georgia court has ruled on the trigger issue, there is simply no basis for Boardman's bad faith claim premised on the use of the manifestation rule." Federated's Oct. 17, 1994, Br. at 49. Similarly, Fireman's Fund argues that it "has not acted in bad faith because there is a bona fide controversy between Fireman's Fund and Boardman with respect to many insurance coverage issues...." Fireman's Fund's Oct. 17, 1994, Br. at 11.

■ The statutory penalty available under O.C.G.A. § 13–6–11 has two prongs. "Bad faith" means bad faith in the transaction out of which the cause of action arose. *Hirsh v. Goodlett*, 196 Ga.App. 127, 128, 395 S.E.2d 626 (1990). "Bad faith" does not mean defendant's conduct in defending the suit. *Salsbury Labs, Inc. v. Merieux Labs., Inc.*, 735 F.Supp. 1555, 1572 (M.D.Ga.1989) (applying O.C.G.A. § 13–6–11), *aff'd*, 908 F.2d 706 (11th Cir.1990). The "stubbornly litigious" and "caused unnecessary trouble and expense" prong of O.C.G.A. § 13–6–11 requires a showing that with no "bona fide controversy" the defendant forced the plaintiff to resort to litigation, employing a "so sue me" tactic. *See Buffalo Cab Co. v. Williams*, 126 Ga.App. 522, 191 S.E.2d 317 (1972).

---

**19.** *Safeco* was a South Carolina case involving underground gasoline storage tanks and a general liability policy apparently very similar to that involved in this case. The general liability policy in *Safeco* stated in pertinent part:

> "Occurrence" means an accident or event, including continuous or repeated exposure to conditions, which result in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

Federated sought contribution from other insurance companies for benefits Federated had paid to its insureds.

■ Defendants correctly argue that there is a bona fide controversy in the insurance industry about trigger of coverage. This fact establishes that Plaintiff cannot recover the statutory penalty provided in O.C.G.A. § 13–6–11 for conduct that is "stubbornly litigious" or that "caused unnecessary trouble and expense."

■ The present disagreement over provisions of the policies does not, however, defeat Boardman's bad faith allegation as a matter of law. Boardman's bad faith argument, as the Court understands it, is that in entering the subject insurance contracts, Defendants misrepresented their position on the trigger of coverage question to entice Boardman's execution of the agreements. However bona fide the industry controversy about trigger of coverage may be, it does not disprove Boardman's allegations of prior intentional misrepresentations by these insurers. On this issue, the Defendants' Motions for Summary Judgment are **DENIED.**

**(4) Is extrinsic evidence admissible to vary the terms of the general liability policies?**

Federated argues that extrinsic evidence is not admissible under Georgia law to vary the terms of an insurance agreement, unless the policy language is ambiguous. *See, e.g.,* O.C.G.A. § 13–2–2(1). Although the Court agrees with this proposition as a general statement of the law, the argument is largely mooted by findings made in this Order, particularly the Court's resolution of the trigger of coverage dispute. As to this issue, Federated's Motion for Summary Judgment is **DENIED.**

**(5) Was Boardman's failure to give Fireman's Fund immediate notice of the contamination at Smile 8 a breach of Fireman's Fund general liability policy?**

■ Fireman's Fund's general liability policy requires Boardman to give Fireman's Fund notice of an occurrence "as soon as practicable." The insured must give "immediate" notice of a claim or suit. The policy states:

INSURED'S DUTIES IN THE EVENT OF OCCURRENCE, CLAIM OR SUIT.

(a) In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable after knowledge of such occurrence is had by the named insured. . . .

(b) If a claim is made or suit is brought against the insured, every demand, notice summons or other process received by the insured or its representative shall be immediately forwarded to the company.

Fireman's Fund argues that Boardman knew of the petroleum contamination at Smile 8 long before the first notice to Fireman's Fund of the contamination. Fireman's Fund's Oct. 17, 1994, Br. at 5. The contamination was discovered in August 1989. Although Boardman gave prompt notice to Federated, it did not notify Fireman's Fund until December 16, 1992.

The sufficiency of notice of a claim is not usually susceptible to resolution as a matter of law. *See Norfolk & Dedham Mut. Fire Ins. Co. v. Cumbaa,* 128 Ga.App. 196, 196 S.E.2d 167 (1973). "The questions of the sufficiency of the excuse offered, and the diligence of the [insured] in giving the notice . . . are generally questions of fact, to be determined by the jury, according to the nature and circumstances of each individual case." *Id.* at 198–99, 196 S.E.2d 167. Plaintiff's arguments and supporting evidence are, at a minimum, enough to raise a triable factual issue regarding the timeliness and adequacy of its notice to Fireman's Fund. On this issue, Fireman's Fund's Motion for Summary Judgment is DENIED.

**(6) Does Boardman's failure to comply with Florida clean-up fund requirements bar coverage under Federated's pollution liability policies?**

■ Federated's pollution liability policies include an endorsement known as "Coordination of Benefits":

As a condition for this insurance to apply, it is agreed that the insured shall: ... (c) comply with all laws, regulations or statutes in order to secure available funds from any governmental funding programs. Any failure or inability to secure funds from any program shall void this insurance to the extent that such funds would have applied to any loss covered under this insurance....

Federated argues that Boardman's claim for reimbursement of clean-up costs incurred as a result of petroleum contamination at Smile 8 was properly denied because Boardman, by failing to comply with Florida's 1984 UST regulations, failed to satisfy Florida's Pollution Liability Insurance and Restoration Program requirements for state funding.

Boardman asserts that the Coordination of Benefits endorsement contradicts the following endorsement known as "Voluntary Clean-up Cost Reimbursement":

We will reimburse the insured in excess of any deductible amount for other "cleanup costs" which are reasonable and necessary that the insured incurs at an "insured site" as a result of a "pollution incident" provided that the "pollution incident" caused "environmental damage" at the "insured site" during the policy period. Any claim for damages or for reimbursement of "cleanup costs" must be made during the policy period.

The Voluntary Cleanup Cost Reimbursement does not reference the Coordination of Benefits endorsement, and the conflicting provisions of the two endorsements are not reconciled elsewhere in the pollution liability policies.

 It is not for the Court to reconcile these endorsements. The insurer bears the burden to prove that an exclusion applies. *Staten v. Gen. Exchange Ins. Corp.*, 38 Ga. App. 415, 418, 144 S.E. 53 (1928); *Livaditis v. Am. Cas. Co.*, 117 Ga.App. 297, 300, 160 S.E.2d 449 (1968). "Exceptions, limitations and exclusions to insuring agreements require a narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations on that coverage in clear and explicit terms." *Alley v. Great Am. Ins. Co.*, 160 Ga.App. 597, 599, 287 S.E.2d 613 (1981). Federated's blanket argument that Boardman's failure to secure government funding for remediation is insufficient to establish as a matter of law that Boardman cannot recover under the pollution liability policies. When an insurer writes two conflicting endorsements, any resulting ambiguity must be resolved in favor of the insured. On this issue, Federated's Motion for Summary Judgment is **DENIED.**[20]

**(7) Does the filing of *Tropic Tint* after the last day of coverage under Federated's pollution liability policy bar coverage thereunder?**

 Federated's pollution liability policy states that "[w]ritten notice of any or all claims must be received by any insured or by us prior to the cancellation or non-renewal of this Coverage Part." Boardman canceled the pollution liability policy on February 15, 1990, before *Tropic Tint* was filed on February 19, 1992. Federated thus contends Boardman failed to notify it of the suit in accordance with policy terms.

Boardman notes that the pollution liability policy contains the following language:

All claims for damages because of "bodily injury" or "property damage" as a result of a single "pollution incident" regardless of the number of claimants will be deemed to have been made at the time the first of those claims is made against any insured.

Boardman maintains that by letter dated September 22, 1989, it put Federated on notice of the contamination discovered at Smile 8. Because the subsequent claim made against Boardman in *Tropic Tint* arose out of the same pollution incident identified by Boardman's September 22, 1989, letter to

---

**20.** Coverage issues under Federated's pollution liability policies are potentially moot. Boardman states: "[i]f the Court rejects Federated's manifestation of trigger of coverage position and the trier of fact finds that the contamination occurred during the 1980 through 1986 period, Boardman will drop its claims for coverage under Federated's pollution liability policy." Boardman's Oct. 17, 1994, Br. at 8–9.

Federated, Boardman contends that the *Tropic Tint* claim should relate back to earlier notice under the above-quoted language.

As discussed above, the sufficiency of notice is generally a factual matter for the jury's consideration. Boardman's arguments and supporting record evidence are sufficient to raise a triable factual issue on this point. Accordingly, on this issue, Federated's Motion for Summary Judgment is **DENIED**.

**(8) Does the "sudden and accidental" pollution exclusion contained in the 1979–1982 general liability policies preclude coverage thereunder?**

Until the 1982 policy year, Federated's general liability policies contained the following exclusion:

This insurance does not apply:

(f) to bodily injury or property damage arising out of the discharge, disbursal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, disbursal, release or escape is sudden and accidental[.]

Federated maintains that under Florida law, this provision excludes coverage under its 1979–1982 general liability policies. Federated's argument in this regard is mooted, however, by the Court's choice of law determination. Federated states that it "does not contend that the 'sudden and accidental' pollution exclusion would bar coverage for the Smile Gas No. 3 claim in Georgia." Fed.'s Oct. 17, 1994, Br. at 47. Federated's summary argument regarding the applicability of the "sudden and accidental" pollution exclusion assumes that "the Smile Gas No. 8 claims are governed by Florida law." *Id.* As discussed earlier, Georgia law applies to the Smile 8 claims. On this issue, Federated's Motion for Summary Judgment is **DENIED**. In light of Federated's concession that the "sudden and accidental" pollution

exclusion does not bar coverage for Smile 3 claims, Plaintiff's Motion for Partial Summary Judgment is **GRANTED** on this issue.[21]

**(9) Does the "owned or rented" property exclusion in Defendants' general liability policies bar coverage of all or a portion of Boardman's claims?**

The "owned or rented" exclusion provides that insurance coverage does not apply "to property damage to (1) property owned or occupied by or rented to the insured...." Defendants argue that Boardman's claims for damage to soil and groundwater on its own property are thereby excluded from coverage. This United States District Court has already determined that the "owned or rented" exclusion does not bar coverage. *Claussen v. Aetna Casualty & Surety Co.*, 754 F.Supp. 1576 (S.D.Ga.1990). The Defendants' efforts to distinguish *Claussen* from the case at bar are uncompelling. On this issue, Plaintiff's Motion for Partial Summary Judgment is **GRANTED**; Defendants' Motions for Summary Judgment are **DENIED**.

**(10) Are the FDER and GDNR letters mandating remediation "suits" within the meaning of Defendants' general liability policies?**

Under the general liability policies, a duty to defend arises when there is a "suit" against the insured. The policies state in pertinent part:

the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damages, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient[.]

Defendants argue that Boardman's claims for the remediation costs Boardman incurred in response to letters from the FDER and GDNR mandating clean-up of the sites did not invoke Defendants' duty to defend. They maintain that the agency letters cannot be

---

**21.** The Court's ruling obviates analysis of Boardman's counter argument regarding the endorse- ment entitled "Clarification of Pollution Exclusion."

equated to a "suit" under the policy. Plaintiff responds that "if Boardman had not begun mitigating its damages and complying with the letters received by the state environmental agencies, an enforcement action would have been brought against Boardman." Boardman's Nov. 15, 1994, Br. at 32. No Georgia case known to the Court addresses this issue.

Under the foregoing principles of Georgia contract construction, the Court recognizes that letters from state environmental agencies mandating remediation technically are not "suits" that invoke the insurers' duty to defend.[22] However, such letters from state environmental agencies have risen to a profile at least as prominent as a "suit" by a private party. I find that such letters are substantially equivalent to a "suit" and may be within the intended meaning of the term "suit" as it is used in the insurance contracts involved in this case. Accordingly, Defendants' Motions for Summary Judgment on this issue are **DENIED**.

### (11) Are costs Boardman incurred to assess and remediate Smile 8 and Smile 3 "damages" as that term is used in Defendants' general liability policies?

■ Federated's general liability policies limit indemnification to "all sums which the insured shall become legally obligated to pay as damages because of property damage." Fireman's Fund's general liability policy contains similar language. One of the bases for the Defendants' denial of coverage in this case is that the environmental clean-up costs are distinct from "damages" under the insurance agreements. Boardman and Fireman's Fund seek summary resolution of this issue.

As Boardman notes, this issue has already been resolved in Georgia. The Georgia Court of Appeals has stated:

A layman, having insured himself against liability for "damages," without further definition or limitation, would reasonably conclude that he is protected from financial loss without regard to the legal basis upon which his liability for his loss might technically be premised. There is nothing in the

instant policies to indicate an intent to exclude from liability coverage such financial loss as would be incurred by [the insured] in complying with EPA-mandated pollution measures.

*Atlantic Wood Industries, Inc.*, 196 Ga.App. at 506, 396 S.E.2d 541.

Regardless of whether the amounts paid by Boardman are called remediation costs, damages, or otherwise, they are still expenses paid out by the insured which should be covered under the general liability policies. Therefore, I find as a matter of law that Boardman's cost to assess and remediate contamination is within the intended scope of "damages" under the general liability policies. On this issue, Plaintiff's Motion for Partial Summary Judgment is **GRANTED**, and Fireman's Fund's Motion for Summary Judgment is **DENIED**.

### (12) Are costs voluntarily incurred by Boardman prior to giving Fireman's Fund notification of a claim covered under Fireman's fund general liability policy?

■ Condition no. 3(c) of Fireman's Fund's general liability policy is a cooperation clause entitled "Insured's Duty in the Event of Occurrence, Claim or Suit." The clause states:

The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for the first aid to others at the time of the accident.

22. As shown below, however, this does not affect the insurers' duty to indemnify.

Relying on *Canadyne–Georgia Corp. v. Continental Ins. Co.*, 1992 WL 547722 (N.D.Ga. 1992), *aff'd* 999 F.2d 1547 (11th Cir.1993), Fireman's Fund argues that as a matter of law it is not liable for pre-notification costs incurred by Boardman. Boardman argues that the cooperation provision is intended to prevent the insured from settling covered claims, which it did not do. Boardman attempts to distinguish *Canadyne.*

Obviously, the cooperation provision's purpose is to make sure that the insurance company has the opportunity to protect and defend its interest, having accepted the risk of the insurance issued. It is fair that the insurer requires the insured to give notice before incurring any costs that the insurer may later be asked to reimburse. The cooperation provision clearly states Boardman's duties in this regard. The Court agrees with Boardman that the law and its responsibility required remediation. However, nothing prevented Boardman from notifying Fireman's Fund first. Boardman voluntarily accepted the risk of not doing so. On this issue, Fireman's Fund's Motion for Summary Judgment is **GRANTED.**

As discussed *supra*, the sufficiency of notice is a question of fact in this case, to be resolved by the jury. Boardman and Fireman's Fund disagree about the timeliness of Boardman's notice of claims to Fireman's Fund. Thus, which expenditures constitute "pre-notification" payments must be determined at trial.

## VI. *Conclusion*

For the foregoing reasons and as specifically set forth, Fireman's Fund Insurance Company's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART;** Boardman Petroleum, Inc.'s Motion for Partial Summary Judgment is **GRANTED IN PART AND DENIED IN PART** and its Motion for Leave of Court to Amend Complaint is **DENIED;** Federated Mutual Insurance Company's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART.** The Clerk is instructed to issue appropriate pretrial notice. The case will promptly proceed to trial of all remaining issues.

**ORDER ENTERED.**

*Appendix A: Boardman Litigation: Insurance Claims Matrix*

**Insurer: Fireman's Fund**

| Policy # | Dates of Coverage | Policy Type | Claims Made by Boardman ? |
| --- | --- | --- | --- |
| MXG–800–89–067 | 8/15/85 to 8/15/86 | Gen. Liability | yes, for both Smile sites |

**Insurer: Federated**

| Policy # | Dates of Coverage | Policy Type | Claims Made by Boardman ? |
| --- | --- | --- | --- |
| 098402 | 8/15/77 to 8/15/78<br>8/15/78 to 8/15/79<br>8/15/79 to 8/15/80<br>8/15/80 to 8/15/81<br>8/15/81 to 8/15/82<br>8/15/82 to 8/15/83<br>8/15/83 to 8/15/84<br>8/15/84 to 8/15/85<br>8/15/86 to 8/15/87 | Gen. Liability (SMP)[23] | yes, through 8/15/85 policy for both Smile sites |

23. SMP refers to Special Multi–Peril policies, which are "occurrence-based" policies.

| | | | |
|---|---|---|---|
| 983633 | 8/15/87 to 8/15/88<br>8/15/88 to 8/15/89<br>8/15/89 to 8/15/90<br>[canceled 10/1/89] | Gen. Liability<br>(CPP) [24] | no |
| 983893 | 10/1/89 to 10/1/90<br>10/1/90 to 10/1/91 | Gen. Liability<br>(CPP) | no |
| 098403 | 8/15/77 to 8/15/78<br>8/15/78 to 8/15/79<br>8/15/79 to 8/15/80<br>8/15/80 to 8/15/81<br>8/15/81 to 8/15/82<br>8/15/82 to 8/15/83<br>8/15/83 to 8/15/84<br>8/15/84 to 8/15/85 | Umbrella<br>(UMB) [25] | yes, as<br>corresponding<br>umbrella<br>policy to<br>gen. liability<br>policy # 098402<br>through<br>8/15/85 |
| 983432 | 8/15/86 to 8/15/87<br>8/15/87 to 8/15/88<br>8/15/88 to 8/15/89<br>8/15/89 to 8/15/90<br>[canceled 10/1/89] | Umbrella<br>(UMB) | no |
| 983894 | 10/1/89 to 10/1/90<br>10/1/90 to 10/1/91 | Umbrella<br>(UMB) | no |
| 868596 | 10/28/86 to 10/28/87 | Primary Pollution<br>(PLP) [26] | no |
| 983633 | 10/28/87 to 8/15/88 | Primary Pollution<br>(PLCP) [27] | no |
| 983945 | 8/15/88 to 8/15/89<br>8/15/89 to 2/15/90 | Primary Pollution<br>(PLCP) | yes, only for<br>Smile # 8 from<br>8/15/89 to<br>2/15/90 |
| 2008534 [28] | 3/22/88 to 8/15/88 | Primary Pollution<br>(PLCP) | no |

24. CPP refers to Commercial Package Policies, which are "occurrence-based" policies.

25. UMB refers to various Umbrella type policies, which correspond to the general liability policies issued to Boardman.

26. PLP refers to Pollution Liability Policies, which are "claims-made" policies.

27. PLCP refers to Pollution Liability Coverage Parts, which provide "claims-made" coverage.

28. This PLCP policy only covers the site at 1714 15th St., Augusta, Georgia, which is not involved in this litigation.