ARROW EXTERMINATORS,
INC., Plaintiff,

v.

ZURICH AMERICAN INSURANCE
COMPANY and Tig Insurance
Company, Defendants.

No. CIV.A.1:99CV1959–TWT.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 30, 2001.

Frederick Newman Sager, Jr., Weinberg Wheeler Hudgins Gunn & Dial, Jay Michael Barber, Kevin Morgan Elwell, Ogletree Deakins Nash Smoak & Stewart, Atlanta, GA, for Plaintiff.

Stephen E. Marshall, Anthony F. Vittoria, phv, Goodell DeVries Leech & Gray, Baltimore, MD, Frederick Newman Sager, Jr., Weinberg Wheeler Hudgins Gunn & Dial, Atlanta, GA, Scott M. Seaman, Michael M. Marick, J. Robert Hall, Eileen King Bower, phv, Meckler Bulger & Tilson, Chicago, IL, Philip Wade Savrin, Freeman Mathis & Gary, Atlanta, GA, for Defendants.

## *ORDER*

THRASH, District Judge.

This is a diversity action arising from Defendants Zurich American Insurance Company and TIG Insurance Company's refusal to pay insurance claims for termite damage. It is before the Court on Defen-

dant TIG's Motion for Partial Summary Judgment [Doc. 54], Plaintiff Arrow's Motion for Partial Summary Judgment [Doc. 56], Defendant Zurich's Motion for Partial Summary Judgment as to coverage trigger [Doc. 57], Defendant Zurich's Motion for Partial Summary Judgment as to Arrow's alleged unpaid deductibles [Doc. 58], and Defendant· Zurich's Motion for Summary Judgment as to TIG's contribution and subrogation claims [Doc. 59]. For the reasons set forth below, the Court grants in part and denies in part Defendant TIG's Motion for Partial Summary Judgment, grants Plaintiff Arrow's Motion for Partial Summary Judgment, denies Defendant Zurich's Motion for Partial Summary Judgment as to coverage trigger, grants in part· and denies in part Defendant Zurich's Motion for Partial Summary Judgment as to Arrow's alleged unpaid deductibles, and grants in part and denies in part Defendant Zurich's Motion for Summary Judgment as to TIG's contribution and subrogation claims.

## I. BACKGROUND

Plaintiff Arrow Exterminators, Inc. ("Arrow") is a Georgia corporation with its principal place of business in Atlanta, Fulton County, Georgia. It is in the business of termite extermination. Defendant Zurich Insurance Company ("Zurich") is a New York corporation with its principal place of business in Schaumburg, Illinois. It is in the business of underwriting and selling insurance policies in the state of Georgia and elsewhere through its authorized agents. Defendant TIG Insurance Company ("TIG") is a California corporation with its principal place of business in Irving, Texas. Like Arrow, TIG underwrites and sells insurance policies in the state of Georgia and elsewhere through its authorized agents.

The facts of this case are as follows. Zurich issued to Arrow a general liability insurance policy effective from August 1, 1993, through August 1, 1994, with an aggregate coverage limit of $2 million and a $10,000 deductible per claim for property damage. The next year, Zurich issued to Arrow a general liability insurance policy effective from August 1, 1994, until August 1, 1995, with an aggregate coverage limit of $2 million and a $5,000 deductible per claim for property damage. The next year, Zurich issued to Arrow a general liability insurance policy effective from August 1, 1995, until August 1, 1996, with an aggregate coverage limit of $2 million and a $10,000 deductible per claim for property damage.

Beginning in August, 1996, Arrow acquired its general liability insurance from TIG instead of Zurich. TIG issued to Arrow a general liability insurance policy effective from August 1, 1996, until August 1, 1997, with an aggregate coverage limit of $2 million and a $5,000 deductible per claim for property damage. TIG also issued to Arrow a general liability insurance policy effective from August 1, 1997, until August 1, 1998, with an aggregate coverage limit of $2 million and a $5,000 deductible per claim for property damage. On November 14, 1997, TIG notified Arrow that TIG would be canceling its coverage of Arrow, effective January 15, 1998. Arrow thereafter was required to obtain insurance coverage from other carriers.

Arrow alleges that the insurance agreements that it entered into with both Zurich and TIG provided that the insurance companies would defend and indemnify Arrow from any termite damage its customers suffered because of Arrow's activities. The Complaint alleges that in 1996, Arrow customers began to make claims for termite damage discovered at that time. When Zurich later was presented with

these claims for termite damage—damage that was discovered after the Zurich policies had lapsed, but that allegedly occurred before the lapse—Zurich refused to pay the claims. Arrow then submitted these claims to TIG, which paid them. Eventually, the $2 million TIG policy limit was exhausted, and TIG informed Arrow that it would no longer pay claims by Arrow customers for termite damage or defend Arrow in lawsuits. Arrow now alleges that the TIG policy limit was exhausted only because TIG paid some unwarranted claims.

As a result, Arrow filed suit in this Court against both Zurich and TIG. Arrow seeks a declaratory judgment on (1) TIG's refusal to pay any additional claims, and (2) whether Zurich is responsible for termite damage that allegedly arose before its policies expired, but that was not discovered until after the Zurich policies expired. Arrow seeks damages for breach of contract against both Zurich and TIG. Arrow also seeks damages against TIG (1) for its alleged negligence in paying unwarranted claims, which eventually exhausted the TIG policy limit, and (2) for false representations it allegedly made.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 158–159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. DISCUSSION

### A. COVERAGE TRIGGER.

This is a diversity action governed by Georgia law. The principal issue raised in the pending summary judgment motions is what coverage trigger the Court should apply to an insurance policy providing that coverage is triggered upon an "occurrence" where the property damage is latent and discovered only later after the expiration of the policy term. "When latent property damages are discovered after the dates of insurance coverage, an issue arises as to whether coverage applies." *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 926 F.Supp. 1566, 1570 (S.D.Ga.1995), *rev'd on other grounds*, 150 F.3d 1327, 1328 (11th Cir. 1998). In the law of property damage, products liability, and mass torts, different "coverage triggers" have been applied to determine liability insurance coverage. These include an exposure trigger, an injury in fact trigger, a manifestation trigger, a continuous trigger, and a multiple trigger. In the context of property damage claims, with an exposure trigger, coverage is triggered when the injury-producing agent first makes contact with the property. Martin J. McMahon, Annotation, *Event triggering liability insurance coverage as occurring within period of time covered by liability insurance policy where injury or damage is delayed—modern cases*, 14 A.L.R.5th 695, 724 (1993). With an injury in fact trigger, coverage is

triggered at the point in time when actual injury first occurs. *Id.* at 729. With a manifestation trigger, coverage is triggered only when damage occurs and is discovered, that is "manifests" itself as readily obvious, within the policy period. *Id.* at 725. With a continuous trigger, all liability policies in effect from the exposure to manifestation provide coverage and are responsible for the loss. *Id.* at 727. The same is true with a multiple trigger. The only difference is that with a multiple trigger all the other individual trigger tests (exposure, injury in fact, and manifestation) are combined in a notion of continuity rather than singularity. James M. Fischer, *Insurance Coverage for Mass Tort Claims: the Debate over the Appropriate Trigger Rule,* 45 Drake L.Rev. 625, 646–47 (1997).

In the context of property damage claims, neither the Georgia General Assembly nor the Georgia appellate courts have ever adopted any of the above coverage triggers by either statute or case law. There are two federal district court cases, one from Judge Bowen in the Southern District of Georgia and the other from Judge Owens in the Middle District of Georgia, that are instructive. In *Boardman Petroleum, Inc. v. Federated Mutual Insurance Company,* 926 F.Supp. 1566, 1577 (S.D.Ga.1995), *rev'd on other grounds,* 150 F.3d 1327, 1328 (11th Cir. 1998), a case involving liability for leaking underground gasoline storage tanks, Judge Bowen concluded that the insurance policy at issue provided for a continuous trigger.[1] The policy stated that it would pay for bodily injury and property damage caused by an "occurrence." Judge Bowen rejected the defendants' argument that the

appropriate trigger was a manifestation trigger and accepted the plaintiff's argument for a continuous trigger. Judge Bowen noted that the case presented an issue of first impression in Georgia, and was "guided only by Georgia principles of contract construction to resolve it." *Id.,* at 1577. "Plain, unambiguous contract language, capable of only one reasonable interpretation, must be enforced." *Id.* On the other hand, "[w]here a provision in a policy is susceptible to two or more constructions, the courts will adopt that construction which is most favorable to the insured." *Id.* (quoting *United States Fire Ins. Co. v. Hilde,* 172 Ga.App. 161, 163, 322 S.E.2d 285 (1984)). In that case, Judge Bowen held that the plain and ordinary meaning of "occurrence" meant that coverage was triggered at the time the gasoline leak first occurred. Nothing in the language of the policy required the leak to be "manifested" or discovered.

The defendants in *Boardman Petroleum* appealed Judge Bowen's decision to the United States Court of Appeals for the Eleventh Circuit. Because "no controlling precedent of the Supreme Court of Georgia or any other Georgia court answers these questions, and [ ] the answers are intertwined with important matters of Georgia public policy," the Eleventh Circuit certified the following two questions to the Georgia Supreme Court pursuant to O.C.G.A. § 15–2–9 (1999):

1. What is the appropriate trigger of coverage under general liability policies such as the ones at issue in this case?

2. Does an "owned or rented" coverage exclusion in general liability policies

---

1. Although the plaintiff in *Boardman Petroleum* described the argued-for trigger as an exposure trigger, the correct term for the trigger it actually sought is a continuous trigger.

*See, e.g., Montrose Chem. Corp. v. Admiral Ins. Co.,* 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878, 893–96 (1995).

such as the ones at issue bar coverage ....?

*Boardman Petroleum Inc. v. Federated Mut. Ins. Co.*, 119 F.3d 883, 884 887–88 (11th Cir.1997); *see* O.C.G.A. § 15–2–9 (1999) (providing procedure for certification of questions to the Georgia Supreme Court by federal appellate courts).

The Georgia Supreme Court responded by answering the second question, concluded that it was dispositive of the case, and declined to address the first question regarding the coverage trigger. *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 269 Ga. 326, 327, 498 S.E.2d 492 (1998). Justice Carley, however, dissented. Justice Carley disagreed with the court on the second question and felt that the court, therefore, must address the first issue. He then addressed the issue of coverage trigger himself, and concluded that a manifestation trigger was not appropriate under general liability policies of the type at issue in the case. *Id.* at 336, 498 S.E.2d 492. Justice Carley discounted the defendants' argument that failing to adopt a manifestation trigger would create a "factual and scientific morass as parties litigate to determine when exposure actually happened." *Id.* at 335, 498 S.E.2d 492. He emphasized that "however potentially difficult the fact-finding task may be, we cannot rewrite the plain terms of the policy." *Id.* Justice Carley concluded that to apply a manifestation trigger would rewrite the policies, "transforming the broader and more expensive occurrence-based policies into 'claims made' policies." *Id.* Because the Georgia Supreme Court's conclusion on the second certified question differed from Judge Bowen's, the Eleventh Circuit reversed and remanded the case without further discussion of the coverage trigger. *Boardman Petroleum, Inc. v.*

*Federated Mut. Ins. Co.*, 150 F.3d 1327, 1328 (11th Cir.1998).

A year later, the coverage trigger issue arose again in *Briggs & Stratton Corporation v. Royal Globe Insurance Company*, 64 F.Supp.2d 1346, 1349–50 (M.D.Ga.1999), another case involving insurance coverage liability for environmental clean-up costs. Like the insurance policies at issue in *Boardman Petroleum*, the policy at issue stated that it would pay for bodily injury and property damage caused by an "occurrence." Judge Owens agreed with Judge Bowen's analysis in *Boardman Petroleum* and concluded that "the policy language at issue does not specifically require that any property damage be discovered in the policy period." *Id.* at 1350.

▮ This case cannot be resolved without deciding the issue of the appropriate coverage trigger. A court sitting in a diversity suit must apply the substantive law of the forum state. *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996), *citing Erie v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

> In determining the law of the forum state, federal court must follow the decisions of the state's highest court, and in the absence of such decisions on an issue, must adhere to the decisions of the state's intermediate appellate courts unless there is some persuasive indication that the state's highest court would decide the issue otherwise.

*Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 945 (11th Cir.1982). When a state's highest court has not addressed an issue, the federal district court must make an "educated guess" as to how the state's highest court would rule. *Benante v. Allstate Ins. Co.*, 477 F.2d 553, 554 (5th Cir.1973)[2];

---

**2.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the

Eleventh Circuit adopted as binding precedent all decisions the former Fifth Circuit

*Floyd v. BIC Corp.,* 790 F.Supp. 276, 277 (N.D.Ga.1992).

Zurich contends that this Court should adopt a manifestation trigger. Arrow argues that a continuous trigger applies in this case because there is no clear and unambiguous statement in the policy that coverage is triggered only by manifestation. TIG also argues that a continuous trigger should apply, although it terms its argument as one for an exposure trigger. Interpretation of contracts, including insurance policies, is ordinarily a question of law for the Court to resolve. O.C.G.A. § 13–2–1 (1982); *see Hartford Cas. Ins. Co. v. Banker's Note, Inc.,* 817 F.Supp. 1567, 1571 (N.D.Ga.1993) (noting that ordinary rules of contract apply to construing insurance contracts and construction and interpretation is generally a matter of law for the court to decide), *aff'd,* 53 F.3d 1287 (11th Cir.1995).

 In interpreting contracts pursuant to Georgia law, courts are directed to follow certain "well known" maxims. *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.,* 269 Ga. 326, 328, 498 S.E.2d 492 (1998) (citing *Richards v. Hanover Ins. Co.,* 250 Ga. 613, 615, 299 S.E.2d 561 (1983)). First, "[w]here the terms are clear and unambiguous, and capable of only one reasonable interpretation, the court is to look to the contract alone to ascertain the parties' intent." *Id.* Second, an insurance provision susceptible to more than one reasonable interpretation is ambiguous, and ambiguities are to be strictly construed against the insurer as drafter of the document and in favor of the insured to provide maximum coverage. *See, e.g., Hercules Bumpers, Inc. v. First State Ins. Co.,* 863 F.2d 839, 841 (11th Cir.1989); *Damar, Inc. v. United States Fire Ins. Co.,* 856 F.Supp. 679, 681–82 (N.D.Ga.

1993), *aff'd,* 21 F.3d 1126, (11th Cir.1994); *Boardman Petroleum,* 269 Ga. at 328, 498 S.E.2d 492; *Hurst v. Grange Mut. Cas. Co.,* 266 Ga. 712, 716, 470 S.E.2d 659 (1996); *Ryan v. State Farm Mut. Auto. Ins. Co.,* 261 Ga. 869, 872, 413 S.E.2d 705 (1992); *Richards v. Hanover Ins. Co.,* 250 Ga. 613, 615, 299 S.E.2d 561 (1983); *Hulsey v. Interstate Life & Accident Co.,* 207 Ga. 167, 169, 60 S.E.2d 353 (1950); *Peachtree Cas. Ins. Co. v. Kim,* 236 Ga.App. 689, 690, 512 S.E.2d 46 (1999); *Brown v. North Am. Specialty Ins. Co.,* 235 Ga.App. 299, 303–04, 508 S.E.2d 741 (1998); *United States Fire Ins. Co. v. Hilde,* 172 Ga.App. 161, 163, 322 S.E.2d 285 (1984). The insurer is the master of the writing, and thus it has a duty to use language that is "clear and precise." *Travelers Indem. Co. v. Whalley Constr. Co.,* 160 Ga.App. 438, 440, 287 S.E.2d 226 (1981). Furthermore, ambiguities are construed in favor of effectuating the purpose of the insurance contract—providing the insured with coverage. *Prudential Ins. Co. of Am. v. South,* 179 Ga. 653, 655–56, 177 S.E. 499 (1934). Third, any exclusion from coverage sought to be invoked by the insurer is likewise strictly construed. *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.,* 269 Ga. 326, 328, 498 S.E.2d 492 (1998); *Richards v. Hanover Ins. Co.,* 250 Ga. 613, 615, 299 S.E.2d 561 (1983); *Brown v. North Am. Specialty Ins. Co.,* 235 Ga.App. 299, 303–04, 508 S.E.2d 741 (1998); *Travelers Indem. Co.,* 160 Ga.App. at 441, 287 S.E.2d 226. Fourth, insurance contracts are to be read in accordance with the reasonable expectations of the insured, where possible. *Boardman Petroleum,* 269 Ga. at 328, 498 S.E.2d 492; *Richards,* 250 Ga. at 615, 299 S.E.2d 561; *Brown,* 235 Ga.App. at 304, 508 S.E.2d 741 (1998).

In construing an insurance policy, the test is not what the insurer intended its

rendered prior to the close of business on September 30, 1981.

words to mean, but what a reasonable person in the position of the insured would understand them to mean. The policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney. *Cincinnati Ins. Co. v. Davis,* 153 Ga.App. 291, 295, 265 S.E.2d 102 (1980).

The Zurich policies involved in this case include the following provisions:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.
>
> \* \* \* \* \* \*
>
> This insurance applies to "bodily injury" and "property damage" only if:
>
> A: The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
>
> B: The "bodily injury" or "property damage" occurs during the policy period.
>
> \* \* \* \* \* \*
>
> "Property damage" means any pest damage which was not indicated on the insured's inspection report, necessitating repair or replacement of damage to real property, and where live active "pest" infestation is found.
>
> \* \* \* \* \* \*
>
> "Occurrence means an active pest infestation of property, including continuous or repeated exposure to substantially the same general harmful conditions."

(Zurich's Memorandum of Law in Support of its Motions for Summary Judgment, Exs. A–3 to A–5.) [Doc. 60] The insurance policies in *Boardman Petroleum* and *Briggs & Stratton* are practically identical to those at issue in this case. All provide that an "occurrence" includes "continuous or repeated exposure" to conditions. The policies in both *Boardman Petroleum* and *Briggs & Stratton* defined an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.,* 926 F.Supp. 1566, 1577 (S.D.Ga. 1995),*rev'd on other grounds,* 150 F.3d 1327, 1328 (11th Cir.1998); *Briggs & Stratton Corp. v. Royal Globe Ins. Co.,* 64 F.Supp.2d 1346, 1350 (M.D.Ga.1999).

▆▆▆▆ The language in the Zurich policies is not ambiguous. Coverage is provided if property damage "occurs during the policy period." The policy form does not say that coverage is provided if property damage "occurs *and is discovered or manifested* during the policy period." The Court must agree with Arrow and TIG that the continuous coverage trigger is appropriate in this case. In doing so, the Court agrees with the analysis of Judge Bowen and Justice Carley in *Boardman Petroleum* and Judge Owens in *Briggs & Stratton.* The Court will not rewrite an occurrence policy into a claims-made policy which in essence is what Zurich is requesting. *Boardman Petroleum,* 926 F.Supp. at 1577 (S.D.Ga.1995); *Briggs & Stratton,* 64 F.Supp.2d at 1350, n. 3 (M.D.Ga.1999); *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.,* 269 Ga. 326, 335–36, 498 S.E.2d 492 (1998). Absent a specific provision in the insurance contract saying that an "occurrence" requires discovery or manifestation, the Court must conclude that such a trigger does not apply. Furthermore, where a contract defines an "occurrence" as including "continuous or repeated exposure," as in this case, the Court concludes that the appropriate trigger is a continuous one.

 The law of Georgia is that insurance companies have a duty to state their intentions clearly when dealing with their insureds. If an insurance company clearly states its intentions and follows the terms of its own policy, the terms will be enforced regardless of the hardship to the insured. *See Payne v. Twiggs County Sch. Dist.,* 269 Ga. 361, 363, 496 S.E.2d 690 (1998) ("[U]nambiguous terms in an insurance policy require no construction, and their plain meaning will be given full effect, regardless of whether they might be of benefit to the insurer, or be of detriment to an insured."); *accord Peachtree Cas. Ins. Co. v. Kim,* 236 Ga.App. 689, 690, 512 S.E.2d 46 (1999). The counterbalancing policy, however, is that if an insurance company does not clearly delineate its intentions, ambiguities will be construed against the insurer and in favor of the insured. "Insurance companies cannot use the vagaries of language they drafted to escape contractual obligations. As author[ ] of the insurance agreements, [Zurich was] obliged to craft precise language that unequivocally captures the parties' mutual understanding of the trigger. [Its] failure to do so was at [its] peril." *Boardman Petroleum,* 926 F.Supp. at 1578 (S.D.Ga.1995).

Zurich argues that there are practical problems that arise in termite cases if a continuous trigger is utilized. It argues that a manifestation trigger lends certainty and predictability of insurance claims handling. It argues that the trial of this case will be messy and protracted. All of this is true. Nevertheless, these practical problems do not change Georgia law or the unambiguous language in the policies. Zurich could have written a policy that provided coverage pursuant to a manifestation trigger. *See Morrow Corporation v. Harleysville Mutual Ins. Co.,* 110 F.Supp.2d 441, 445 (E.D.Va.2000)("Specifically, these policies required an 'occurrence' of bodily injury or property damage to trigger coverage, and the policies defined an 'occurrence' as 'the date on which bodily injury or property damage first manifests itself.'") It did not. The Court is duty bound to follow the clear path of the law even when it leads inexorably to messy and protracted litigation.

## B. COURSE OF DEALINGS AND ESTOPPEL

 Zurich contends that Arrow's course of dealings with both Zurich and TIG in respect to the termite-related property damage claims indisputably shows that all parties considered the policies to be governed by a manifestation trigger. Zurich also contends that it detrimentally relied on this course of dealings. Accordingly, Zurich contends that Arrow and TIG are estopped from raising the coverage trigger issue and arguing for a continuous trigger. A party's course of performance accepted or acquiesced over a period of time without objection must be accorded weight in interpreting contracts if the contract is ambiguous. *See Kohlheim v. Glynn County, Ga.,* 915 F.2d 1473, 1479 (11th Cir.1990) (citing *Restatement (Second) of Contracts* § 202(4) (1981)); *see also Georgia Railroad Bank & Trust v. Federal Deposit Ins. Corp.,* 758 F.2d 1548, 1551–52 (11th Cir.1985) ("The courts are to afford greater regard to the clear intent of the parties than any particular words which they may have used in expressing their intent."). In this case, the policy language at issue is not ambiguous. Furthermore, both policies provided that they could not be amended except by an endorsement issued by Zurich and made part of the policy. Zurich may not rely upon an

alleged course of dealings to rewrite the policies.

■ The doctrine of estoppel applies when the representations or conduct of a party cause another party to act "in reliance thereon to the latter's detriment." *Carter v. Digby*, 244 Ga.App. 217, 219 n. 8, 535 S.E.2d 273 (2000); *Georgia Farm Bureau Mutual Ins. Co. v. Vanhuss*, 243 Ga.App. 26, 27, 532 S.E.2d 135 (2000); *Allstate Ins. Co. v. Sapp*, 223 Ga.App. 443, 445, 477 S.E.2d 869 (1996); *Adler's Package Shop v. Parker*, 190 Ga.App. 68, 73, 378 S.E.2d 323 (1989). Zurich's estoppel argument must fail because it cannot show detrimental reliance as a matter of law. The evidence shows that Zurich likely would have asserted that the policy was governed by a manifestation trigger regardless of Arrow or TIG's actions. Robert Koscielniak, head of Zurich's pest control program testified:

Q: If Arrow had said to you, "We don't want you to apply date of discovery as the trigger," would you have said, "Too bad. That's what we're going to do."

A: That's a hypothetical. Yeah, I think we would. I know I would.

(Robert Koscielniak Deposition, at 176.) Koscielniak also admitted that "[t]he bottom line is, Zurich was going to apply a manifestation trigger anyway," and that Zurich always defaulted to a manifestation trigger unless state law specifically required otherwise. (*Id.* at 169–70, 227–29.) Accordingly, the Court must conclude that the course of dealings alleged by Zurich does not as a matter of law preclude Arrow and TIG from arguing that a continuous trigger applies to the insurance policies at issue in this case.

## C. UNPAID DEDUCTIBLES

■ In one of its Motions for Summary Judgment, Zurich contends that Arrow is required to pay the deductibles it owes Zurich. It argues that Arrow is required to pay a separate deductible for each policy triggered by a claim. First, the Court cannot conclude at this stage of the litigation that Zurich is entitled as a matter of law to recover for any unpaid deductibles that *might* exist. Each of the Zurich policies contain per claim deductibles. Zurich, however, has not provided unrefuted factual evidence of specific unpaid deductibles. Accordingly, this issue must await more detailed determination at trial. The number and amount of owed deductibles, and even the applicability of defenses to Arrow must await more factual detail. Consequently, the issue is not yet appropriate for disposition on summary judgment. Second, however, the Court concludes that Arrow is required to pay a separate deductible for each policy triggered by a claim. In doing so, the Court notes that "Arrow concedes that, in the event the Court determines that a continuous trigger of coverage is appropriate, Arrow would owe a deductible for each policy implicated in a particular claim." (Plaintiff's Response to Defendants' Motions for Summary Judgment, at 23.) [Doc. 88] Because the Court has determined that a continuous trigger is appropriate, no dispute exists that Arrow must pay separate deductibles.

## D. SUBROGATION AND CONTRIBUTION

■ Zurich contends that TIG is not entitled to contribution or subrogation from Zurich. Under Georgia law, an insurer has standing to pursue claims for contribution and subrogation against a co-insurer that has refused to pay its share of a loss that both insurers owe. *Aetna Cas. & Sur. Co. v. Empire Fire & Marine Ins.*

*Co.,* 212 Ga.App. 642, 646–47, 442 S.E.2d 778 (1994); *Continental Ins. Co. v. Federal Ins. Co.,* 153 Ga.App. 712, 714–15, 266 S.E.2d 351 (1980). Contribution is the right of one who has discharged a common liability to recover from another who is also liable the portion that the second party ought to pay. *Black's Law Dictionary* 328 (6th ed.1990). Contribution applies only "where one has paid more than his share of the common burden which all are equally bound to bear." *Wages v. State Farm Mut. Auto. Ins. Co.,* 132 Ga.App. 79, 83, 208 S.E.2d 1 (1974). "[I]f two insurance companies are obligated to pay a loss and one company pays the entire loss or more than its *pro rata* share of the loss, the one so paying has a right of action against the co-insurer for a ratable proportion of the amount paid." 2 Allen D. Windt, *Insurance Claims and Disputes,* § 10.01 (3d ed.1999). Of course, "the paying insurer will have to prove that the insured had a right of recovery under the nonpaying insurer's policy." *Id.* Subrogation, as distinguished from contribution, is "[t]he substitution of one person in the place of another with reference to a lawful claim, demand or right, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies, or securities." *Black's Law Dictionary* 1427 (6th ed.1990). Under the doctrine of subrogation, if an insurer makes a payment under compulsion of law, the insurer may be entitled to (a) be reimbursed by the insured if the insured recoups his loss from a third party or (b) "step into the shoes" of the insured and assert any cause of action against a third party that the insured could have asserted for his or her own benefit had the insured not been compensated by the insurer. Windt, *supra,* at § 10.05.

Zurich bases its contention that TIG is not entitled to contribution or subrogation on four different arguments. First, Zurich contends that TIG's own conduct in adjusting claims using a date of first discovery trigger precludes TIG from seeking contribution, subrogation, or any other relief against Zurich. Zurich argues that it would be inequitable to permit TIG to recover from Zurich because TIG knew that Zurich was adjusting Arrow's termite-related property damages claims by using a date of first discovery trigger and that TIG was doing likewise. This is basically Zurich's estoppel argument that the Court rejected above. The actions of the various parties in this regard is subject to different reasonable interpretations. Accordingly, the Court cannot conclude as a matter of law that these alleged actions by TIG prevents it from seeking contribution or subrogation against Zurich.

■ Second, Zurich contends that TIG cannot prove that the termite-related property damage for which it seeks contribution or subrogation took place within any Zurich policy period. TIG, however, has raised a fact issue that the damage did take place within the Zurich policy period. The Court cannot conclude as a matter of law at this stage of the litigation that it did not. Consequently, the Court cannot conclude that this policy-period argument by Zurich prevents contribution or subrogation by TIG as a matter of law.

■ Third, Zurich contends that to the extent that TIG overpaid on the termite-related property damage claims, it did so as a volunteer. According to Zurich, its policies' "voluntary payments" provisions preclude coverage for payments made without its authorization. Zurich's argument, however, has been rejected by the Georgia Court of Appeals. In *Continental Insurance Company v. Federal Insurance*

*Company,* 153 Ga.App. 712, 714–15, 266 S.E.2d 351 (1980), the court required Continental to pay its share of the liability despite the fact that it originally refused to contribute to the loss that the insured incurred. The court emphasized that a contrary holding would create a system whereby insurers would refuse to pay, thus forcing recovery efforts solely on the co-insurer, and then would use their original refusal to pay as a shield to hide from their obligations:

> Nor can the defendant under these circumstances contend that the settlement voluntarily made by the co-insurer and the plaintiff without its consent or authority vitiated its contractual obligations to the insured; for the defendant's alleged wrongful abdication of its status and responsibilities as an insurer by its denial of liability and contention that the policy of insurance with its insured was void, put the plaintiff and co-insurer in the place of both co-insurers with the rights of both, including the right to settle claims against the insured without litigation. The defendant, therefore, having thrust sole responsibility upon the plaintiff insured and the co-insurer, cannot escape its obligations to reimburse the plaintiff on the ground that it was not a party to the settlement. To hold otherwise would permit a co-insurer which disavowed its obligations to the insured to escape its duties without injury because of the performance of those duties by the insured in cooperation with the co-insurer.

*Id.* at 715, 266 S.E.2d 351 (quoting *Rutledge v. Dixie Auto. Ins. Co.,* 106 Ga.App. 577, 580, 127 S.E.2d 683 (1962)). In this case, Arrow and TIG both provided Zurich with notice of claims that they at all times contended were covered by Zurich policies through a continuous coverage trigger. Zurich refused these claims, arguing that a manifestation trigger applies. Having decided not to participate in the settlement of these claims, Zurich cannot now escape its obligations by saying that TIG settled the claims without its authorization. A contrary ruling by this Court would create a serious disincentive for settlement of insurance claims.

▬ Zurich also contends that Zurich is a volunteer for any payments in excess of $25,000 to Gates condominium claimants. According to Zurich, Arrow effectively limited its liability for its exterminating services to the amount of a $25,000 guarantee. Thus, Zurich argues, to the extent that Arrow had any liability to its customers in connection with the termite-related property damage claims, that liability was contractually limited to $25,000 per unit. Because TIG paid claimants in excess of $25,000 per unit, these excess amounts constitute volunteer payments. TIG responds by arguing that it properly ignored the damages limitation because it insured Arrow against tort exposure only and not contractual liability. The limitation of liability does not appear to the Court to apply only to contractual liability even if TIG is correct that it insured Arrow only against tort claims. Such limitations of liability are enforceable. *Orkin Exterminating Co. v. Stevens,* 130 Ga.App. 363, 369, 203 S.E.2d 587 (1973). Thus, TIG has the status of a volunteer with respect to claims subject to the $25,000 per unit limitation of liability to the extent that it paid more than this sum.

▬ Fourth, Zurich contends that TIG cannot obtain contribution or subrogation from Zurich to the extent that Zurich owes no duty to indemnify Arrow for the claims at issue and to the extent that Zurich has

paid the amounts required in accordance with the parties' agreed upon treatment of the termite-related property damage claims against Arrow. Basically, these are affirmative defenses that Zurich raises. A subrogee "stands in [the] shoes" of the subrogor and "assume[s] only those claims that [the subrogor] has, subject to any defenses that could be asserted against [the subrogor]." *Parks v. State Farm Gen. Ins. Co.*, 238 Ga.App. 814, 817, 520 S.E.2d 494 (1999). Although Zurich may have stated a correct statement of the law of subrogation, it has not alleged undisputed facts in this argument that would show that it is entitled to judgment as a matter of law here. Zurich in its summary judgment motions has only alleged one defense. That defense is the one based on coverage trigger, which the Court has resolved in Arrow and TIG's favor. Zurich has not presented any other coverage defenses to the Court for adjudication at this stage of the case. Consequently, the Court cannot conclude as a matter of law that Zurich is entitled to them.

## E. NEGLIGENCE

 TIG contends that Arrow's negligence claims against it must be dismissed. Arrow in Counts III and IV of its Complaint has alleged that TIG acted negligently in handling the claims at issue and in the training, retraining, and employing of its insurance adjusters who handled the claims at issue in this case. TIG responds, however, that in Georgia the relationship between an insurer and insured is simply a contractual one. "[T]he mere breach of an ordinary contract does not constitute a tort; and if there is no liability except that arising out of a breach of a purely contractual duty, the action must be in contract, and an action in tort cannot be main-

tained." *Leonard v. Firemen's Ins. Co.*, 100 Ga.App. 434, 435, 111 S.E.2d 773 (1959); *see also Hanson v. Aetna Life & Cas.*, 625 F.2d 573, 575 (5th Cir.1980) (stating that wrongful refusal to pay constituted no more than a beach of contract); *Cummings v. Prudential Ins. Co.*, 542 F.Supp. 838, 841 (S.D.Ga.1982) ("The rule simply stated is that a breach of contract does not constitute a tort, even if it results in hardship to the non-breaching party unless the contract creates a type of relationship upon which the law implies certain duties, a breach of which is a tort."). An exception exists, however, where there is a special relationship between the parties that creates an independent duty. The Eleventh Circuit applying Georgia law has held:

> This independent duty may be found because of the relationship between the parties, or because of the defendant's calling or because of the nature of the harm. The contractual relationship between insurer and insured creates such an independent duty, implied from the terms of the contract, between insurer and insured: the insurer owes to the insured a duty independent of the contract not to injure him, and when, from its negligent failure or refusal to adjust a claim, or from fraud or other bad faith, he sustains damages other than damages covered by the insurance contract, then an action in tort would be appropriate.

*Delancy v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536, 1545–46 (11th Cir.1991) (citations and internal quotations omitted). This special exception most commonly arises in the insurance context in those situations where an insurer refuses to settle a claim.

 The Court concludes that in this case Arrow has not established the exis-

tence of a special duty outside the context of the insurance agreement. First, the alleged negligence does not touch on a refusal by TIG to settle claims, but rather its willingness to settle claims too readily. A liability insurer, however, "may in good faith and without notification to others, settle part of multiple claims against its insured even though such settlements deplete or exhaust the policy limits so that remaining claimants have no recourse against the insurer." *Miller v. Georgia Interlocal Risk Management Agency*, 232 Ga.App. 231, 231, 501 S.E.2d 589 (1998) (quoting *Allstate Ins. Co. v. Evans*, 200 Ga.App. 713, 714–15, 409 S.E.2d 273 (1991)). Second, Counts III and IV only arise from the manner in which the claims were adjusted and, therefore, raise only breach of contract issues. The Georgia Court of Appeals' decision in *Tate v. Aetna Casualty & Surety Company*, 149 Ga.App. 123, 124, 253 S.E.2d 775 (1979), is very much on point and very illustrative in this regard. In *Tate,* the insured brought a lawsuit against his insurer that included a count for negligence. The plaintiff in *Tate* alleged that the insurer was negligent for "using an unlicensed and incompetent adjuster and personnel," "failing to use due care to include all of plaintiff's losses under the law," and "failing to properly inspect plaintiff's losses and property." *Id.* at 123, 253 S.E.2d 775. These allegations are almost identical to this case in which Arrow is claiming that TIG was negligent in processing claims and using inexperienced and incompetent adjusters. In concluding that the trial court properly dismissed the tort claims, the Georgia Court of Appeals reasoned as follows:

> "Even where it is shown that the defendant's failure to perform resulted in great annoyance or hardship to the plaintiff, recovery in tort is available

only if the insurance contract is within those "certain classes of contracts that create a relation from which the law implies duties a breach of which will constitute a tort" .... The duty, for a breach of which an action *ex delicto* lies must be a duty imposed by law as to some relationship, general or special, as applied to that class of cases where the alleged duty arises out of a contract ...."

*Id.* at 124, 253 S.E.2d 775. The court then stated that "[a]t most there was a breach of contract on the part of the defendant by failing to pay the plaintiff the full amount of damages owed under the terms thereof." *Id.* at 125, 253 S.E.2d 775. Accordingly, based on the general rule precluding tort liability and the Georgia courts determination in *Tate* that the incompetency of adjusters and processors does not fall within the special exception, the Court must grant summary judgment in favor of TIG on Arrow's negligence claims against it.

### F. BAD FAITH DAMAGES

 TIG contends that it is entitled to summary judgment on Arrow's claim for bad faith damages pursuant to O.C.G.A. § 33–4–6. Arrow seeks recovery for damages related to Arrow's defense of claims denied by TIG after exhaustion of the policy limits. If certain demand requirements have been met, O.C.G.A. § 33–4–6 provides that an insured may recover up to 25 percent of his loss as a penalty plus attorneys' fees if the insurer's refusal to pay a claim was in bad faith. The insured must first prove that a demand for payment was properly and timely lodged against the insurer prior to the filing of suit. *Cagle v. State Farm Fire & Cas. Co.,* 236 Ga.App. 726, 727, 512 S.E.2d 717

(1999); *Primerica Life Ins. Co. v. Humfleet*, 217 Ga.App. 770, 771–72, 458 S.E.2d 908 (1995). The purpose of the demand requirement is to notify the insurer that it is facing a bad faith claim for a specific refusal to pay so that it may decide whether to pay the claim. *Primerica*, 217 Ga. App. at 772, 458 S.E.2d 908. Although no particular language is required, the language used must be sufficient to alert the insurer that a bad faith claim will be asserted if the specific loss noted is not paid. *Id.* Because O.C.G.A. imposes a penalty on the insurer, the statute must be strictly construed. *Cagle*, 236 Ga.App. at 727, 512 S.E.2d 717; *Howell v. Southern Heritage Ins. Co.*, 214 Ga.App. 536, 537, 448 S.E.2d 275 (1994); *Progressive Cas. Ins. Co. v. Avery*, 165 Ga.App. 703, 704, 302 S.E.2d 605 (1983).

In this case, the purported May 13, 1998, demand letter, written by Arrow's counsel in this case, states in its entirety:

This firm has the pleasure of representing Arrow Exterminators, Inc. In that regard, we have been referred the matter of your company's handling of claims submitted on behalf of Arrow, and your denial of Arrow's attempts to obtain information regarding the claims being paid by TIG and its claims agent, Midlands.

Arrow's efforts to obtain information about its own claims have been met with nothing but stonewalling by your office. For example, your office continues to change the individuals in charge of the Arrow account and claims processing, which is totally unacceptable. Every time representatives from Arrow or its agents contact TIG, they are told of yet another individual being assigned to the account. When contacted, this individual will then claim to know nothing about the problems being experienced by Arrow.

Moreover, as you know, the Gates Condominium Association, Inc. has made several high dollar claims. TIG, and its agent, Midlands, have inexplicably paid claims which are not termite damage related. Because of this improper handling of these claims, TIG is now apparently taking the position that the aggregate under the applicable insurance policies has been exhausted, and no further claims will be paid. This is unacceptable.

Had the Gates claims been adjusted properly, the aggregate would not be close to exhaustion. Moreover, Arrow had a limit of $25,000 per unit in place for each of the 32 unites at the gates. (As you know, only about half of the units have made claims.) Accordingly, the total amount that could be paid under all damage claims at the Gates would be $800,000. TIG, however, has seen fit to pay in excess of that even though approximately half of the units made claims. With the Gates now having outstanding claims in excess of one million dollars, with several large claims outstanding, TIG, because of its negligent handling of claims, cannot now take the position that the aggregate is exhausted.

It is likely that the Gates will initiate litigation to recover on the additional claims being submitted by the unit owners at that project. Please be advised that Arrow will hold TIG and Midlands Claims fully responsible for any and all claims being submitted by Gates, as well as other Arrow customers, because of the negligent or intentional mishandling of Arrow's claims. If Arrow had been apprized of these large claims payments,

including paying for repairs totally unrelated to termite damage, this matter could have been avoided. However, because of your company's conduct in this matter, TIG must be responsible for and continue to pay the claims as submitted.

Please contact me immediately to discuss the matter.

/s/ Jay Michael Barber

(Complaint, Ex. 8.) [Doc. 1]

This purported demand letter fails to meet the procedural prerequisites for two reasons. First, it does not contain any reference whatsoever to a claim for bad faith. The term "bad faith" is not included anywhere in the letter. The applicable statute is not cited as a shorthand. The letter does not even state that Arrow itself is contemplating litigation against TIG. Second, the letter does not request that TIG pay any specific loss. The letter merely expresses general dissatisfaction with the manner in which TIG adjusted claims and disagrees with TIG's contention that the aggregate limit had been exhausted. Because Georgia courts require that the demand requirements be strictly construed and Arrow's purported demand letter entirely fails to meet the requirements, the Court must grant summary judgment in favor of TIG on Arrow's claim for bad faith damages.

## IV. CONCLUSION

For the reasons set forth above, Defendant TIG's Motion for Partial Summary Judgment [Doc. 54] is GRANTED IN PART AND DENIED IN PART. Plaintiff Arrow's Motion for Partial Summary Judgment [Doc. 56] is GRANTED. Defendant Zurich's Motion for Partial Summary Judgment as to Coverage Trigger [Doc. 57] is DENIED. Defendant Zu-rich's Motion for Partial Summary Judgment as to Arrow's alleged unpaid deductibles [Doc. 58] is GRANTED IN PART AND DENIED IN PART. Defendant Zurich's Motion for Summary Judgment as to TIG's Contribution and Subrogation Claims [Doc. 59] is GRANTED IN PART AND DENIED IN PART. The parties shall contact the Court's Courtroom Deputy Clerk to schedule a status conference to be held within thirty (30) days following the docketing of this Order.